**John T. KEARNS, Plaintiff, Appellant,**

v.

**KEYSTONE SHIPPING COMPANY,
Defendant, Appellee.**

**No. 88–1655.**

United States Court of Appeals,
First Circuit.

Heard Nov. 3, 1988.

Decided Dec. 22, 1988.

---

Edmund M. Pitts with whom Pitts & Pitts, Boston, Mass., was on brief for plaintiff, appellant.

Douglas F. Seaver with whom Timothy Q. Feeley and Gaston & Snow, Boston, Mass., were on brief for defendant, appellee.

* Of the District of Massachusetts, sitting by designation.

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

CAFFREY, Senior District Judge.

At the close of a three-day trial on the plaintiff's age discrimination claim, the jury retired at 3:25 in the afternoon to deliberate. After failing to reach a verdict, the jury was excused at 4:10 p.m. and resumed its deliberations the following morning at 9:30. At 10:08 that morning, after a total of one hour and eighteen minutes of deliberation over two days, the jury returned its verdict for the plaintiff and awarded him $99,000 in back pay. Finding that the verdict went against the clear weight of the evidence, Judge Mazzone of the United States District Court of Massachusetts granted the defendant's motion for a new trial. At the subsequent trial, with Judge Harrington presiding, the jury reached a verdict in favor of the defendant. Plaintiff timely appealed Judge Mazzone's order granting the new trial and we now affirm.

Two issues are now before us: (1) whether it was an abuse of discretion for the district court to set aside the initial verdict for the plaintiff on the grounds that it went against the clear weight of the evidence, and (2) what effect we should give to the jury's brief deliberation time. In the numerous cases where we have considered a trial court's grant or denial of a motion for a new trial, we have applied the following standard of review:

> [A]n appellate court must sustain the granting of a new trial unless there has been an abuse of discretion. Where the basis for a new trial is that the verdict is contrary to the great weight of the evidence, the modern trend has been away from earlier decisions that the district court's discretion is virtually unlimited.

*Borras v. Sea–Land Service, Inc.,* 586 F.2d 881, 887 (1st Cir.1978), and cases cited therein. As we explained in *Borras:*

Today it is often said that an appellate court will exercise "a closer degree of scrutiny and supervision" where the basis for the new trial is the trial court's evaluation of the weight of the evidence rather than the trial court's feeling that an "undesirable or pernicious element," such as trial error or prejudicial statements, obtruded into the trial.

*Id.* Thus, while the district court's discretion is not unlimited when it comes to considering a new trial motion, the district court's ruling should be disturbed on review only when there has been a clear abuse of discretion. In order to determine whether such an abuse occurred here, we must review the record below. We do this not in the role of "a thirteenth juror," assessing the credibility of witnesses and weighing testimony, but rather to isolate the factual basis for the trial court's ruling and provide the foundation for our action today.

## I. BACKGROUND

The plaintiff-appellant, John T. Kearns ("Kearns"), was hired by the defendant-appellee, Keystone Shipping Co. ("Keystone"), on August 4, 1983, to work as a Qualified Member of the Engine Department ("QMED") on the S.S. Energy Independence. When he was hired, Kearns had 35 years of experience in the merchant marine and was 60 years old. The Energy Independence was a new ship and Kearns was part of her first crew. This was also a permanent or "steady" job, and, as such, was hard to come by in the shipping business.

At first Kearns worked a rotation of 45 days on board and 45 days off, but Keystone changed its scheduling policies so that unlicensed crew members like Kearns worked 30 days on and 30 days off. Kearns' job duties essentially involved monitoring and servicing the ship's mechanical systems, general cleaning, and maintenance. He worked regular "watches" in the engine department from 4:00 to 8:00 a.m. and 4:00 to 8:00 p.m. daily, and worked overtime from 8:30 a.m. to 3:45 p.m. daily, with breaks for meals. Every third week Kearns had "sanitary" duty, which involved cleaning the laundry and recreational rooms and the passageways and hallways of the ship. Peter Garthwaite, then 29 years old and a second assistant engineer, was Kearns' boss during his daily regular watch hours on his first 45-day tour on the Energy Independence. Garthwaite was later promoted to first assistant engineer and in that position he supervised Kearns' overtime assignments. Garthwaite then was responsible for Kearns' overtime duties not on a regular basis, as on the first tour, but rather whenever his 45-day tours and Kearns' 30-day tours overlapped.

On direct examination at trial, Kearns testified that, after six months without receiving any complaints about his work, sometime around mid-February 1984 Garthwaite suddenly confronted him and told him to get off the ship. When Kearns asked why, Garthwaite allegedly answered that the Energy Independence was "a young man's ship" and Kearns did not belong on it because he was over 50 years old. Kearns testified that he related this conversation to the chief engineer, Lewis Ludwig, who responded, "Do me a favor, John, stay on." Kearns completed his tour and after 30 days off, returned to the ship. Another confrontation with Garthwaite then occurred and on March 17, 1984, Kearns signed a letter of resignation that read, "I, John Kearns, am resigning from my position as QMED as of this date." Kearns left the Energy Independence on March 19, 1984.

On cross examination, Kearns admitted that his first six months on the Energy Independence had not been entirely free of complaints. A second assistant engineer, Mr. Drake, complained that Kearns did not answer the telephones in the engine room while he was on watch. A third assistant engineer, Mr. Cowans, complained that Kearns pumped the bilges while the ship was in port, in violation of Coast Guard regulations, and eventually instructed Kearns never to pump the bilges while Cowans was on watch. Keystone also introduced into evidence a warning letter

Kearns received, dated January 26, 1984, that reads in its entirety:

> The first engineer Mr. P. Garthwaite has warned you in the past about when trach [sic] can be dumped. On this day Jan. 26, 84 at approx. one half hour after departure from the bar, after our discharge in Brayton Pt., still in sight of land you dumped trash which included waste furl [sic] oil. This caused pollution of the outter [sic] harbor.
>
> You are hear by [sic] worned [sic] that a repeat of this or any other offense will be cause of dismissal from this vessel.

This letter is signed by chief engineer Ludwig, Garthwaite, Kearns, and a union representative. When questioned about the first sentence of the letter, Kearns could not explain the discrepancy between his statement that there had been no other complaints about his work and the statement, "The first engineer ... has warned you in the past. . . ."

Kearns' case in chief consisted of his testimony and the testimony of Cecil Curtis, another QMED on the Energy Independence. Mr. Curtis' testimony addressed only the issue of wages and established the amount Kearns might have earned had he stayed on the Energy Independence. Keystone's case consisted of the testimony of several witnesses, including Garthwaite, chief engineer Ludwig, Ted Cowans, a third assistant engineer, and Cecil Curtis. Their combined testimony presents a story quite different from Kearns'. Whereas Kearns had testified that he did not answer the telephone in the engine room because he could not hear it or was in the "fiddly" checking stack temperatures, both Curtis and Garthwaite testified that the telephone system had a siren that could be heard throughout the engine room and the only way to check stack temperatures was on the main console, not on the stacks themselves. Curtis also testified that the Energy Independence was equipped with holding tanks so that it would not be necessary to pump the bilges into the harbor while the ship was in port, even for several days.

Finally, Curtis testified that he had never been ordered to throw trash overboard while the ship was in port or near land, in direct conflict with Kearns' statement that he had only been following instructions when he dumped trash in sight of land.

Garthwaite testified that Kearns frequently pumped the bilges without authorization and in port, against regulations and contrary to instructions posted on the bilge pump. Garthwaite also confirmed Curtis' testimony that it was impossible to check the temperature of the stacks in the way Kearns had described. Garthwaite described several incidents involving improper trash dumping, failure to answer the telephones in the engine room, and general "skylarking," or avoiding assigned work.

Most importantly, Garthwaite testified and produced work records that substantiated his testimony that he was not even on board the Energy Independence on the day that Kearns alleged their conversation about his age took place. And Garthwaite explained that the union to which Kearns belonged, the National Maritime Union of America, was responsible for filling all unlicensed positions (such as QMED) on the ship, and the union hired on the basis of seniority. Keystone therefore had no control over the age of the unlicensed personnel it hired. In addition, although Kearns testified that Garthwaite threatened to "blackball" him if he did not leave the ship, Keystone introduced evidence that showed that one of Kearns' temporary jobs following his departure from the Energy Independence was in an unlicensed position on another Keystone vessel.

After Keystone completed the presentation of its case, the trial court permitted Kearns to take the stand again as a "rebuttal" witness.[1] In this final testimony, Kearns corrected his earlier testimony concerning the date of his conversation with Garthwaite. Kearns explained that he had mistakenly calculated the date of the conversation based on a 45-day rotation, rath-

---

1. At trial, Keystone objected to the court's decision to permit this testimony, but this issue was not raised on appeal.

er than the 30–day rotation he was then on. When the 30–day rotation is taken into account, it moves the conversation back to the end of January when Garthwaite was on the ship, Kearns testified.

At the close of the three-day trial, the jury was charged and retired to deliberate. After one hour and eighteen minutes of deliberation over two days, the jury answered "yes" to the special question, "Was age the 'determining factor' in the plaintiff's discharge?" and awarded Kearns damages in the form of back pay totaling $99,000. The court then granted Keystone's motion for a new trial.

## II. THE WEIGHT OF THE EVIDENCE

■■■ As Wright and Miller have so aptly explained, "[t]he power of a federal judge to grant a new trial on the ground that the verdict was against the weight of the evidence is clear. The standard that is to control in passing on motions of this kind is not." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2806 (1973). In this Circuit, we have addressed the "standard that is to control" and have variously described it as "the clear weight of the evidence," *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 7 (1st Cir.), cert. denied, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *Johnson v. A/S Ivarans Rederi*, 613 F.2d 334, 351 (1st Cir. 1980), cert. dismissed, 449 U.S. 1135, 101 S.Ct. 959, 67 L.Ed.2d 325 (1981); and as "the great weight of the evidence." *Borras v. Sea–Land Service, Inc.*, 586 F.2d 881, 887 (1st Cir.1978). Under either description of the standard, the district court "has the power and duty to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." 11 C. Wright & A. Miller, § 2805. We note that this duty is tempered with our concern that "the trial judge's discretion, although great, must be exercised with due regard for the rights of both parties to have questions which are fairly open resolved finally by the jury at a single trial." *Coffran*, 683 F.2d at 6. Only with appropriate caution and to prevent a miscarriage of justice should a trial court set aside a jury verdict, and only on a finding of an abuse of discretion should a reviewing court set aside the trial court's determination. After close scrutiny of the record below, we find no abuse of discretion.

When Judge Mazzone allowed the defendant's motion for a new trial, he wrote:

> I agree completely with the defendant's recital and analysis of the evidence as set out in Ground # 1 ... This jury could not have deliberated for more than 20 minutes, effectively, on each of 2 days —a total of 40 minutes—and reached a verdict that was so clearly against the weight of the evidence as to constitute a gross miscarriage of justice. As I said to counsel at post-trial conference, I cannot allow the verdict to stand.

"Ground # 1" of the defendant's argument addressed the weight of the evidence standard. Keystone argued that Kearns failed to introduce any evidence of discriminatory motive, and failed to introduce any testimony that corroborated his statements concerning his work record and the key conversation with Garthwaite. Keystone also pointed out that Kearns alleged no ill treatment by Garthwaite when Garthwaite had daily supervision of his regular watches, but only later, when their rotations occasionally overlapped and Garthwaite supervised Kearns' overtime work. Most persuasively, Keystone argued that Kearns impeached his credibility when he changed his testimony after Keystone introduced evidence showing that Garthwaite was not on board the Energy Independence on the day Kearns initially claimed their conversation took place. Our review of the record leads us to agree with the trial court's ruling that the clear weight of the evidence favors the defendant. In the face of overwhelming testimony and evidence that conflicted with Kearns' version of events, and the strong impeaching factors that Keystone brought out at trial, it was not an abuse of discretion for the trial court to determine that the verdict constituted a gross miscarriage of justice.

## III. JURY DELIBERATION

■■ The second issue Kearns raises on appeal is the trial court's determination

that the jury acted in a "casual and nondeliberative manner" in reaching its verdict in such a short period of time. Brief jury deliberation is not, in itself, sufficient basis to support a new trial motion. The United States Court of Appeals for the Fourth Circuit once upheld the trial court's denial of a new trial motion where the jury had deliberated only four minutes, *Segars v. Atlantic Coast Line R.R.*, 286 F.2d 767 (4th Cir.1961), and the Fifth Circuit Court of Appeals has stated that "[i]f the evidence is sufficient to support the verdict, the length of time the jury deliberates is immaterial." *Marx v. Hartford Accident & Indemnity Co.*, 321 F.2d 70, 71 (5th Cir.1963). When brief jury deliberation is coupled with a verdict that is contrary to the great weight of the evidence, however, it creates a situation where the district court has an affirmative duty to set aside the verdict. *See Borras*, 586 F.2d at 886 (quoting *Aetna Casualty & Surety Co. v. Yeatts*, 122 F.2d 350, 352 (4th Cir.1941)) ("Even though there may be substantial evidence that would prevent the direction of a verdict or a judgment n.o.v., it is 'the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that the verdict is against the clear weight of the evidence....'"). Such was the duty facing the trial court below. We find no abuse of discretion in the court's decision to grant the new trial motion.

■ One final wrinkle remains. When the trial court denied the plaintiff's motion for recusal, he explained his earlier ruling as follows:

It was not my assessment of Kearns' credibility that prompted my decision to grant a new trial, but the completely casual and non-deliberative manner in which the jury decided important and somewhat complicated issues.

Kearns asks that we reverse the trial court on the basis that this "embroidery" of an earlier ruling constitutes an abuse of discretion. Our careful reading of the statement above, coupled with the court's explanation for granting the new trial motion, *supra*, reveals no abuse of discretion. The court was responding to the particular arguments advanced by the plaintiff. This statement does not alter or compromise the earlier statement in any manner.

For the reasons stated above, the district court's ruling is *affirmed*.