# United States Court of Appeals
## For the First Circuit

No. 11-1988

OUSMAN CHAM,

Plaintiff, Appellant,

v.

STATION OPERATORS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Thompson, Circuit Judges.

Mark P. Gagliardi for appellant.
Neal J. McNamara, with whom Nixon Peabody LLP was on brief,
for appellee.

July 16, 2012

**LYNCH, Chief Judge**.  In this employment discrimination suit, Ousman Cham alleges that the defendant, Station Operators, discriminated against him on the basis of race and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and retaliated against him for taking medical leave, in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq.

This appeal follows two trials.  At the first trial, the district court dismissed the Title VII claims before the case was submitted to the jury, and the jury returned a verdict in favor of Cham on the FMLA claim.  The district court then granted Station Operators's motion for a new trial.  Only the FMLA retaliation claim was at issue in the second trial, and the jury returned a verdict for Station Operators on that claim.

Cham appeals, challenging (1) the dismissal of his disparate treatment Title VII claim during the first trial, (2) the grant of the defendant's motion for a new trial, and (3) the exclusion of certain evidence during the second trial.  We reject Cham's claims of error and affirm.

I.

A.    Factual Background

Ousman Cham was at the time of the second trial a thirty-two year old Muslim and a native of The Gambia who had immigrated to the United States in 2000.  Cham worked for the defendant,

-2-

Station Operators, Inc. (a division of Exxon Mobil) from May 13, 2003, to May 20, 2005, at an Exxon Mobil gas station and convenience store in Smithfield, Rhode Island.

Cham was hired by Station Operators as a sales associate, a term for a cashier and clerk, and so remained for the duration of his employment. Cham was hired as a part-time hourly employee and shortly thereafter became a full-time hourly employee. Cham testified that he was regularly scheduled to work forty hours per week once he became a full-time employee. The undisputed testimony at trial was that no employee was entitled to any particular shift and that Cham did not have a contract with Station Operators guaranteeing him any shifts or even forty hours per week. Full benefits were provided at thirty-two hours a week.

In February 2004, Andrew Pelletier became the new assistant manager at the Smithfield store and so became Cham's supervisor. Pelletier took over scheduling responsibilities in September of 2004, and became manager in December 2004. Cham claims his hours began to be reduced when Pelletier took over scheduling.

While under Pelletier's supervision, on December 20, 2004, Cham was scheduled to work an eight-hour shift, but did not come in or inform the store that he would not be able to work. Cham testified that his car broke down on the way back from New York and he did not have access to a phone to call in to work.

-3-

Cham was placed on probation for violating company policy by failing to notify the store that he would not be able to make it to work.

A few weeks later, on January 17, 2005, Cham was injured in a car accident. The next day, Cham informed Pelletier that he was taking FMLA leave from January 18 to February 15, 2005, due to a back injury sustained in the accident, on his doctor's recommendation. At some point during this leave, Cham informed Pelletier that his leave would need to be extended until March 14, 2005, and Cham remained out of work until March 14.[1]

When Cham returned to work, he was consistently scheduled to work thirty-two hours per week, although his actual work hours fluctuated. Sometimes he worked less than scheduled. For example, Cham "called out" on two shifts; that is, he called to say he could not work those shifts. Cham claimed this reduction in scheduled hours was in retaliation for taking FMLA leave and in violation of Title VII. Cham quit his employment at Station Operators on May 20, 2005, two days after suffering a panic attack at work that sent him to a hospital emergency room for treatment.

_____

[1] While Cham's leave ended on March 14, Pelletier did not schedule Cham for any hours during that week. Payroll records indicate that Cham did in fact work 25.5 hours that week.

-4-

B.        Procedural History

    Cham filed suit against Station Operators on May 6, 2008, in Rhode Island state court.[2]  Cham's initial complaint alleged that Station Operators discriminated against him on account of race, national origin, and religion, in violation of Title VII and certain state-law provisions.  The complaint pled disparate treatment, failure to promote, and hostile work environment theories under Title VII.

    Station Operators removed the case to federal court on August 29, 2008.  Cham filed a second amended complaint on February 2, 2010, which added new claims of interference with FMLA rights and retaliation in violation of the FMLA.  The second amended complaint also added sex discrimination as one of the bases of the Title VII claim.

    Cham's FMLA and Title VII theories were advanced in his pretrial memorandum as pled in the second amended complaint, with Cham additionally contending that the disparate treatment amounted to a constructive discharge.  At a January 18, 2011 pretrial conference, Cham agreed to dismissal of his Title VII failure to promote claim and his FMLA interference claim as time-barred.

---

    [2]  Cham filed a charge of workplace discrimination with the Rhode Island Commission For Human Rights and the Equal Employment Opportunity Commission on February 8, 2006, and received notice of his right to sue from both entities in February 2008.

Cham's first jury trial, which lasted four days, began on January 24, 2011, on his disparate treatment and hostile work environment claims under Title VII, the FMLA retaliation claim, and certain pendent state-law claims. At the close of plaintiff's evidence, Station Operators moved for judgment on all claims under Federal Rule of Civil Procedure 50(a). Cham's counsel agreed to dismiss the hostile work environment claim. The remainder of the motion was disputed. The court dismissed the hostile work environment claim as agreed, and took the motion under advisement as to the FMLA retaliation claim and the Title VII disparate treatment claim.

At the close of all the evidence, Station Operators renewed its Rule 50(a) motion as to all claims, which the court took under advisement. At the start of the final day of trial, Cham moved for judgment as a matter of law under Rule 50(a) on his two remaining claims. Cham clarified that he was no longer advancing a Title VII claim of on the basis of religion or sex, leaving national origin and race as the bases of his disparate treatment claim. The district court denied Cham's motion and granted Station Operators's motion for judgment as a matter of law as to the Title VII disparate treatment claim. Only the FMLA retaliation claim went to the jury, and it returned a verdict in favor of Cham and awarded $20,000 in damages. No final judgment was entered.

-6-

On February 25, 2011, Station Operators filed a motion for judgment as a matter of law under Rule 50(b) or, in the alternative, a new trial under Rule 59, as to the FMLA retaliation claim, which Cham opposed.

On June 3, 2011, the district court denied the defendant's request for judgment as a matter of law on the FMLA retaliation claim but granted the request for a new trial on that claim. Cham v. Station Operators Inc., 832 F. Supp. 2d 131 (D.R.I. 2011). The court explained that a great deal of prejudicial evidence had been introduced which was relevant to the hostile work environment claim but was irrelevant to the FMLA retaliation claim. Id. at 139. The court noted that the hostile work environment claim was voluntarily dismissed by plaintiff after the evidence was introduced. Id. The court concluded this evidence "had great potential to confuse the jury and to unfairly prejudice Station Operators," and so granted the motion.[3] Id.

Station Operators filed two motions in limine before the second trial, the allowance of which are claimed to be error. First, the court excluded evidence of Cham's work hours and schedules for all time periods before September 2004. Second, the

---

[3] On June 13, 2011, Cham moved for reconsideration of both the district court's grant of the motion for a new trial as well as the Rule 50 dismissal of his disparate treatment claim during the first trial. The court denied both motions at the start of the second trial.

court excluded the testimony of two health care providers who had treated Cham for a panic attack on May 18, 2005.

The second trial, restricted to the FMLA retaliation claim, lasted three days, and the jury returned a verdict in favor of Station Operators. The district court entered judgment in favor of Station Operators and Cham timely appealed.

## II.

Cham argues that the district court erred (1) in granting Station Operators's Rule 50 motion to dismiss his disparate treatment claims, (2) in granting Station Operators's Rule 59 motion for a new trial, and (3) in granting the motions in limine excluding evidence of his work hours before September 2004 and his panic attack. We reject each challenge.

A.      Rule 50 Dismissal of the Title VII Disparate Treatment Claim

We review de novo a grant of judgment under Rule 50(a). J.R. v. Gloria, 593 F.3d 73, 78 (1st Cir. 2010). A district court may grant a Rule 50 motion before the case is submitted to the jury if, after the party "has been fully heard on an issue," the court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The court considers "[a]ll of the evidence and reasonable inferences drawn from the evidence . . . in the light most favorable to the non-moving party," and may not evaluate the credibility of the witnesses or the weight of the evidence. Malone

-8-

v. Lockheed Martin Corp., 610 F.3d 16, 20 (1st Cir. 2010) (alteration in original) (quoting Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002)) (internal quotation marks omitted). However, "the plaintiff is not entitled to inferences based on speculation and conjecture." Id. (quoting Vázquez-Valentín v. Santiago Diaz, 385 F.3d 23, 30 (1st Cir. 2004), rev'd on other grounds, 546 U.S. 1163 (2006)) (internal quotation marks omitted).

The McDonnell Douglas burden-shifting framework, see McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), governs the "allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases," as here, St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).

"First, the plaintiff must establish a prima facie case of discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). "Generally, a plaintiff establishes a prima facie case by showing that (1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action against him; and (4) the position remained open or was filled by a person with similar qualifications." Kosereis v. Rhode Island, 331 F.3d 207, 212-13 (1st Cir. 2003). The last two elements may "var[y] according to the nature of the plaintiff's claim," but "require[], among other things, a showing of an adverse employment action." Alvarado-Santos v. Dep't of Health, 619 F.3d 126, 132 (1st Cir. 2010), cert. denied, 132 S. Ct. 121 (2011).

Once the plaintiff makes out a prima facie case, the burden of production shifts to the defendant to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" St. Mary's, 509 U.S. at 507 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). If the defendant produces such evidence, the McDonnell Douglas framework "disappear[s]" and the sole remaining issue is "discrimination vel non." Reeves, 530 U.S. at 142-43 (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983)) (internal quotation marks omitted). The ultimate burden of persuasion always remains on the plaintiff, who must be afforded an opportunity to show that the reasons offered by the defendant were a pretext for discrimination. Id. at 143; see also Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 447-48 (1st Cir. 2009).

Cham's theory of discrimination is that Pelletier permanently reduced his scheduled weekly hours on account of race or national origin several times after Pelletier assumed responsibility over work schedules in September 2004: (1) from forty hours to thirty-two hours during holiday weeks, as soon as Pelletier took charge, (2) from forty to thirty-two hours following Cham's return from FMLA leave on March 14, 2005, and (3) from thirty-two hours to twenty-four hours in mid-May 2005.

That Cham established the first two elements of a prima facie case is not disputed. The parties do dispute whether Cham's

-10-

hours were reduced and, if so, whether the reduction amounted to an adverse employment action; whether Cham was treated less favorably than employees outside of his protected class;[4] and whether there is sufficient evidence from Cham that Station Operators's proffered non-discriminatory justification was pretextual.

We affirm the district court's rejection of Cham's claims. The loss of a shift on holiday weeks fails because any such loss does not rise to the level of an adverse employment action. An adverse employment action "typically involves discrete changes in the terms of employment, such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)), cert. denied, 131 S. Ct. 978 (2011). To be adverse, an employment action "must materially change the conditions of plaintiffs' employ." Id. (quoting Gu v. Bos. Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002)) (internal quotation marks omitted).

---

[4]  "The time to consider comparative evidence in a disparate treatment case is at the third step of the burden-shifting ritual, when the need arises to test the pretextuality vel non of the employer's articulated reason for having acted adversely to the plaintiff's interests," as opposed to as part of a plaintiff's prima facie case. Kosereis v. Rhode Island, 331 F.3d 208, 213 (1st Cir. 2003) (quoting Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999)).

Cham's claim is based on the purported loss of three shifts during the weeks encompassing Labor Day, Thanksgiving, and Christmas. Such a reduction simply does not rise to the level of an adverse employment action in the context of a workplace where schedules fluctuate and no employee is entitled to any given shift. Further, the decision did not cause a "significant change in benefits." Id. (quoting Burlington Indus., 524 U.S. at 761) (internal quotation mark omitted). It is clear from the record that the fluctuation in hours above thirty-two hours did not affect Cham's benefits.

As to Cham being scheduled for a twenty-four hour shift for one week in May 2005, that likewise does not amount to an adverse employment action. Such a reduction for a single week is not an adverse employment action. There is no evidence that such a reduction was to last for longer than a week, nor that a one-week reduction would lead to a loss of benefits provided to full-time employees, such as health insurance. We also reject out of hand Cham's extreme argument that a one-week reduction amounts to a constructive discharge, as Cham's working conditions were not rendered "so difficult or unpleasant that a reasonable person in [his] shoes would have felt compelled to resign." Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010) (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 28 (1st Cir. 2002)) (internal quotation mark omitted).

-12-

Cham's final variant of his disparate treatment claim is that his work schedule was reduced from forty to thirty-two hours a week upon his return from FMLA leave. Cham's theory is that he normally was scheduled to work, and did in fact work, five eight-hour shifts per week, but that upon returning from FMLA leave his Friday-night shift was taken away, reducing his scheduled hours to thirty-two per week. Station Operators argues that Cham's work hours fluctuated and his scheduling upon his return was within the scope of this normal variation.

Whether Cham's evidence that there was a drop in scheduled hours after his FMLA leave is sufficient to make a prima facie case is questionable. Station Operators's records of employees' scheduled hours for all of 2004, except for the last week, were lost and so not in evidence. As a result, while the evidence is undisputed that Cham was scheduled for thirty-two hours a week from March 23, 2005 to May 25, 2005, and that he was scheduled for forty hours from January 5, 2005, to February 2, 2005, there is no evidence as to Cham's scheduled hours during 2004. Given the lack of schedules, it is impossible to compare Cham's scheduled hours from before the last week of December 2004 to the hours for which he was scheduled after his return from FMLA leave. The undisputed testimony at trial was that no employee was entitled to any particular shift and that Cham did not have a contract with Station Operators guaranteeing him any shifts. In

terms of Cham's hours actually worked, there was substantial fluctuation in Cham's weekly hours before he took FMLA leave.

Nevertheless, there was a drop in the hours that Cham actually worked from the data available -- Cham worked an average of approximately 40.83 hours per week before the FMLA leave (averaged over the course of his employment), and an average of approximately 30.38 after leave.

Even assuming that this reduction for a non-regularly scheduled employee amounted to an adverse employment action for Title VII disparate treatment purposes, Cham failed to provide sufficient evidence that Station Operators's proffered explanation was pretextual. The court did not err in granting Station Operators's Rule 50 motion. We may "bypass the prima facie case issue because it is clear that plaintiff has not mustered enough evidence for a reasonable jury to conclude that [the defendant's] stated reason" for the employment action was pretextual. Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 100 (1st Cir. 2007); see also Reeves, 530 U.S. at 148 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." (emphasis added)); Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 471 (1st Cir. 2010); Rathbun v. Autozone, Inc., 361 F.3d 62, 72 (1st Cir. 2004). This reasoning applies to Rule 50 motions to dismiss at

trial.  See Reeves, 530 U.S. at 150 ("[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986))); see also Dance v. Ripley, 776 F.2d 370, 373-74 (1st Cir. 1985) (affirming dismissal of plaintiff's claim at the close of plaintiff's evidence because the defendant put forth a legitimate, nondiscriminatory reason during plaintiff's case and the plaintiff presented no evidence demonstrating pretext).

The legitimate explanation, through Pelletier's testimony, was that he had to hire two extra employees and needed to give them hours.  One was hired to cover Cham's shifts when Cham was on FMLA leave.[5]  Further, Cham had, before the leave, received overtime hours and Station Operators's policy was to avoid employees working overtime.  When Cham returned to work, Pelletier kept the new hire to cover some shifts, including the hours Cham complains about, and Pelletier testified that this hiring, rather than any racial animus, motivated the scheduling decisions.  One of the reasons the court gave for granting the motion was that "while Mr. Cham was on leave, someone was hired to cover his shifts," and

---

[5]  Pelletier admitted on cross-examination that one of the employees was not hired until after Cham returned from medical leave.  It is undisputed that the second employee was hired while Cham was on FMLA leave to cover Cham's shifts.

that this was a legitimate reason for Cham's scheduling when he returned from leave.

There is no evidence of pretext. Pelletier, the supervisor Cham claims was racially motivated to reduce his hours after the FMLA leave, did not materially reduce Cham's hours from September 2004, when Pelletier took charge of scheduling, to January 2005, just before Cham's FMLA leave. Cham's own testimony was that his particular forty hour schedule began in November 2004, under Pelletier. Under Pelletier, Cham was the highest paid sales associate during the relevant time period. Moreover, upon his returning from FMLA leave, Cham's scheduled hours were equal to or greater than most of the other employees at the Station Operators location. This included the employee who was hired to cover some of Cham's shifts while he was on leave as well as the employee who was hired shortly after his return from leave.

Further, there is little evidence of racial animus. While Cham testified that Pelletier made certain remarks, Cham's voluntary dismissal of his hostile work environment claim is indicative of the fleeting nature of any such comments. Moreover, such "'stray workplace remarks' . . . normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus." Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002).

Cham offers two arguments as to why Station Operators's explanation was pretextual. First, Cham claims that a Caucasian employee, Joe Parker, was similarly situated and did not have his scheduled hours reduced from forty to thirty-two. However, Cham introduced no evidence as to Parker's schedule before January 2005, and instead compares his schedule to Parker's only over the course of a few months in 2005. Further, Cham introduced no evidence as to any hours Parker actually worked at any point in time. Finally, Cham and Parker worked different shifts (Parker worked the night shift), reducing any similarity between the two. These considerations undermine Cham's comparison to Parker. See García v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008) (to demonstrate pretext by "producing evidence that plaintiff was treated differently from similarly situated employees," a plaintiff "must show that others similarly situated to [him] in all relevant respects were treated differently by the employer" (emphasis added) (quoting Kosereis, 331 F.3d at 214) (internal quotation marks omitted)).

Second, Cham claims that he was disciplined more harshly in December 2004 than a Caucasian employee for similar violations of company policy. First, the form of discipline Cham received (being placed on probation) imposed no additional tangible consequences over the form of discipline the other employee received (a written warning). Second, the two situations are not

-17-

comparable: while both Cham and the Caucasian employee were disciplined for failure to appear for their scheduled shifts, Cham had failed to provide any notice to Station Operators that he would not be able to work, whereas the other employee informed Station Operators that he would not be able to work thirty minutes after his shift was supposed to begin.

The district court did not err in granting the Rule 50 motion.

B.      Rule 59 Grant of a New Trial

We review the district court's grant of a new trial for abuse of discretion. Jennings v. Jones, 587 F.3d 430, 435 (1st Cir. 2009). A trial court may grant a new trial "on the basis that the verdict is against the weight of the evidence." Id. at 436. Moreover, "the district court has the power and duty to order a new trial whenever, in its judgment, the action is required in order to prevent injustice." Id. (quoting Kearns v. Keystone Shipping Co., 863 F.2d 177, 181 (1st Cir. 1988)) (internal quotation marks omitted). The district court may "independently weigh the evidence" in deciding whether to grant a new trial. Id.

The district court's reason for granting a new trial here was that because Cham's hostile work environment and disparate treatment claims had been dismissed, the jury had been exposed to much evidence that was irrelevant, and could be both prejudicial and confusing, to Cham's FMLA retaliation claims. Cham, 832 F.

Supp. 2d at 139-40. The district court found that such "irrelevant evidence had great potential to confuse the jury and to unfairly prejudice Station Operators," particularly given that the timeliness of Cham's FMLA retaliation claim depended on whether Station Operators's violation was "willful" in nature. Id. at 139.

The district court did not abuse its discretion. The admission of evidence that later becomes irrelevant when one or more claims is rejected as a matter of law prior to submission to the jury may be grounds for granting a new trial, if deemed unduly prejudicial. See MacPherson v. Univ. of Montevallo, 922 F.2d 766, 777 (11th Cir. 1991); cf. SEC v. Happ, 392 F.3d 12, 28 (1st Cir. 2004) (an erroneous admission of evidence may be grounds for granting a new trial, if refusing to grant a new trial "appears to the court inconsistent with substantial justice" (quoting Fed. R. Civ. P. 61) (internal quotation marks omitted)).

Here, it is beyond question that most of the prejudicial evidence was introduced in support of Cham's hostile work environment claim and was rendered irrelevant when Cham voluntarily agreed to dismissal of the claim. To the extent any of it was introduced solely as to the disparate treatment claim, it became irrelevant when the court dismissed that claim under Rule 50.

Cham argues that the evidence was not sufficiently prejudicial to warrant a new trial. Often, where evidence is rendered irrelevant because certain claims are dismissed before the

case goes to the jury, the appropriate response is to instruct the jury to disregard the evidence.[6] See Guthrie v J.C. Penny Co., 803 F.2d 202, 208 (5th Cir. 1986) (declining to reverse district court denial of a motion for a new trial where evidence as to pain and suffering became irrelevant when certain claims were dismissed before trial, and noting that there was a "less drastic remedy of an explicit instruction to the jury" on the matter); see also Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose -- but not against another party or for another purpose -- the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."). Despite Station Operators's failure to request such an instruction, it was within the court's discretion to grant the more drastic remedy of a new trial.

There are times where such irrelevant evidence is sufficiently prejudicial that a limiting instruction will not be sufficient and a new trial is proper. See MacPherson, 922 F.2d at 777 (affirming district court's grant of a new trial in part because evidence admitted in support of a disparate impact theory, which was dismissed at the close of plaintiff's case, was no longer relevant).

---

[6] The district court did inform the jury, prior to closing argument, that the only claim they would hear argument on was the FMLA retaliation claim, and that the jury "should not concern yourselves with the reasons why you're not going to be hearing about the other claims."

This was a judgment call for the experienced trial judge who sat through the first trial and was able to gauge the effect of the evidence on the jury.  See Correia v. Feeney, 620 F.3d 9, 11 (1st Cir. 2010) (noting that "we owe much deference to the trial court's [new trial] determination").  The district court provided a cogent explanation for its result, particularly given that Cham had to prove that the FMLA violation was "willful" for his claim to be timely,[7] and the irrelevant evidence could have affected the willfulness finding.

The district court concluded there would be a miscarriage of justice if the verdict were to stand.  Cham, 832 F. Supp. 2d at 139-40.  In reaching that conclusion the court commented on the vagueness of the hostile environment evidence as well as that evidence's lack of connection to race.  Id. at 139.  The court stated "[n]one of this evidence has any bearing on the FMLA retaliation claim that ultimately went to the jury, and Cham's counsel, recognizing the claim's lack of merit, voluntarily withdrew the hostile environment claim but only after putting the extraneous evidence before the jury."  Id. (emphasis added).

_____

[7] See 29 U.S.C. § 2617(c) (providing a two-year statute of limitations for FMLA violations and a three-year statute of limitations for willful FMLA violations).

C.        Evidentiary Rulings During the Second Trial

Cham appeals rulings on two motions in limine excluding evidence before the second trial, where only the FMLA retaliation claim was at issue.

"We review a district court's decision to admit or exclude evidence for abuse of discretion."  Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 62-63 (1st Cir. 2011).  Further, only those evidentiary rulings that affect a party's "substantial rights" might warrant overturning a verdict.  Torres-Arroyo v. Rullán, 436 F.3d 1, 8 (1st Cir. 2006); see also Fed. R. Civ. P. 61; Fed. R. Evid. 103(a).

Cham's first argument is that it was error to grant Station Operators's motion in limine to exclude evidence of Cham's work hours and schedules prior to September 2004.  The district court excluded the evidence on the basis that "anything prior to that time would be too attenuated from" the FMLA retaliation claim, which "begins in May 2005."

We reject Cham's argument.  The district court reasonably determined that an appropriate cut-off date for evidence as to Cham's weekly hours was September 2004, because that was when the allegedly retaliatory supervisor, Pelletier, became responsible for employee scheduling.  While evidence of hours before September 2004 may have been marginally relevant under Rule 401, the district court did not abuse its discretion in excluding the evidence under

Rule 403.  See Fed. R. Evid. 403.  Further, there was no prejudice since the proffered evidence showed that Pelletier as of September 2004 continued to assign essentially the same hours.  The point of Cham's claim had to do not with September 2004 but with the claimed reduction in hours beginning in March 2005, after his FMLA leave.

Cham also argues error in the exclusion of evidence of his panic attack and trip to the hospital emergency room on his final day of work at Station Operators, along with the corresponding testimony of two medical providers.  The district court reasoned that compensatory damages were not available for FMLA retaliation claims, as opposed to the first trial where the hostile work environment claim was still pending, and so the testimony of the medical providers was not relevant.

Cham argues that the evidence was relevant to prove that the alleged FMLA retaliation he suffered amounted to a constructive discharge, and the harm to Cham's health was relevant to whether the working conditions amounted to a constructive discharge.

The district court did not abuse its discretion in excluding the evidence as prejudicial or confusing under Rule 403. The court had heard testimony during the first trial of the mental health provider who treated Cham that the onset of depression and anxiety was four or five months before the May 2005 panic attack -- before Cham returned from FMLA leave, and so necessarily before any purported retaliation took place.

-23-

### III.

The judgment of the district court is affirmed.