# United States Court of Appeals
## For the First Circuit

No. 12-1956

KEITH PEARSON,

Plaintiff, Appellant,

v.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Howard, Circuit Judge,
Souter,[*] Associate Justice,
and Stahl, Circuit Judge.

Mitchell J. Notis for appellant.
Jeffrey A. Dretler, with whom Walter B. Prince and Price Lobel Tye LLP were on brief, for appellee.

July 15, 2013

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice**.  Keith Pearson appeals the district court's summary judgment for his employer, the Massachusetts Bay Transportation Authority (MBTA), on Pearson's claims of employment discrimination and retaliation.  We affirm.

I

A

The MBTA operates the Boston subway and bus system, and employs Pearson, who was hired in 1990 as a "maintainer" and promoted in 1994 to his current position of "signal inspector."  In this job, he supervises a team of maintainers to ensure that trains get proper upkeep and that any problems with service are quickly resolved.  Pearson is one of six signal inspectors, who report to the four maintenance supervisors: Russell Fairhurst, Ernest Morrison, John McCabe, and Jan Hagan.  The supervisors report to the Superintendent of the Signal Department, Thomas Cary, who reports to the Deputy Director of Signals and Communications, Peter Bertozzi, who in turn reports to the Director of Systemwide Maintenance and Improvements, John Lewis.  Charles O'Reilly, the Senior Director of Infrastructure and Engineering, supervises Lewis, and at the end of this protracted chain of command sits Daniel Grabauskas, the general manager of the MBTA.  Pearson is African-American, as are Fairhurst, Morrison, and Lewis.  The others are Caucasian.

Pearson's employment by the MBTA has been punctuated by discord, and he has been disciplined several times for reasons such as inattendance, discourtesy, and insubordination. The conduct giving rise to this litigation began with a November 2004 instruction from Fairhurst to Pearson that his team fix a problem at the Arlington Street Station. Pearson failed to get the job done and received a five-day suspension with a "Discipline Slip," informing him that he had "reached the <u>final warning stage</u> of [MBTA's] progressive disciplinary track. . . . [A]ny further violation[s] . . . will result in further disciplinary action, the termination of your employment." J.A. 62.

Pearson committed another violation on September 12, 2006, when Hagan instructed him to go with a crew of maintainers to Sullivan Square Station to fix malfunctioning track circuits. Pearson never reported to Sullivan Square, and the circuits were not fixed for three hours. The next day, Cary requested written statements from Hagan and Pearson, and Cary then discussed the appropriate discipline with Bertozzi, Lewis, and O'Reilly. Although the MBTA's policies provided that discharge was warranted for Pearson's dereliction in light of his disciplinary history, the four decided to recommend only a demotion to allow Pearson to keep his job. On September 21, Cary drafted a memorandum to Bertozzi recommending that Pearson be demoted, but before he delivered it, he sent it to the MBTA's labor relations department, under the MBTA

policy to seek labor relations's approval before imposing any discipline.

Josh Coleman, a labor relations representative, received Cary's letter and on September 29 asked Cary for more information about Pearson's record and the September 12 incident. During his investigation, Coleman learned from a union representative that because Pearson was behind on his union dues, he might not be eligible to drop-back to maintainer by bumping a junior employee. The union representative also indicated that Pearson intended to file a grievance, no matter what the discipline was. With this information in mind, the labor relations department concluded that termination was proper and recommended it to Cary, as against demotion. At this time, neither Coleman nor his supervisor, Brian Donohoe, was aware than Pearson was African-American. On October 24, Fairhurst issued Pearson a Discipline Slip, stating that he was "hereby suspended for thirty (30) days with a recommendation for discharge." J.A. 520.

Two weeks later, Pearson wrote a letter to Senator Edward Kennedy, complaining of mistreatment and of on-going racial unrest at the MBTA, and the next month, Senator Kennedy wrote to the MBTA leadership, referring to Pearson's allegations. On January 5, 2007 an investigator from the MBTA's Office of Diversity and Civil Rights met with Pearson and his lawyer, but Pearson declined to take part in any investigation when he learned that the focus would

be general racial discrimination at the MBTA, as opposed to his termination.

At some point after his October 24, 2006 suspension, Pearson did file a labor grievance concerning his termination, which was denied on January 8, 2007. Bertozzi then sent a memo to the MBTA leadership, dated January 18, 2007, formally recommending Pearson's discharge, with copy to the labor relations department, which at that point conducts a full, independent review of any proposed termination and submits a separate recommendation memorandum to the General Manager. After losing Pearson's file, labor relations eventually concurred with Bertozzi's recommendation in a May 1 memo to Grabauskas, who fired Pearson on May 2. Three months later, Pearson filed claims with the Massachusetts Commission Against Discrimination (MCAD) and the Equal Employment Opportunity Commission (EEOC) alleging discrimination and retaliation.

Following his discharge, Pearson also availed himself of arbitration in challenging the denial of his grievance. On October 22, after a two-day hearing, the arbitrator ruled for Pearson, concluding that the MBTA had lacked just cause to terminate him because Hagan's directive that Pearson report to Sullivan Square was "nuanced enough to be subject to reasonable misinterpretation." J.A 524. The arbitrator ordered Pearson's reinstatement, and the MBTA reinstated him to his former position on January 7, 2008, with

full back pay and benefits.  When Pearson returned to work, the discord resumed, and he has been disciplined at least three times since his reinstatement.

B

In October 2008, Pearson filed a complaint against the MBTA in the district court, alleging racial discrimination in violation of Mass. Gen. Laws ch. 151B and 42 U.S.C. § 2000e, as well as unlawful retaliation, in violation of the same provisions. He contended that his October 24, 2006 suspension and termination as recommended constituted racial discrimination, that his eventual termination was retaliation for contacting Senator Kennedy, and that various MBTA employees discriminated against him after his return to work and retaliated against him for filing charges with the MCAD and EEOC.  Thus, he alleged four violations: (1) discrimination in his suspension and discharge; (2) discrimination in the MBTA's post-reinstatement conduct; (3) retaliation by termination for his letter to Senator Kennedy; and (4) retaliation in the MBTA's post-reinstatement treatment, in response to his filing administrative charges.

The MBTA moved for summary judgment.  After briefing and argument, the magistrate judge recommended that the motion be granted on the claim of discriminatory suspension, finding that the "record more than adequately establishes a legitimate, non-discriminatory reason for the termination," J.A. 538, and that

-6-

Pearson had failed to prove that the MBTA's reason was pretextual. The magistrate also recommended rejection of both retaliation claims. She found no causal link between the termination and Pearson's letter to Senator Kennedy, which was sent after the recommendation to fire him, and found that Pearson had failed to allege a materially adverse employment action after his reinstatement, causally related to his administrative charges. The magistrate made no recommendation on the racial discrimination allegations tied to the conduct occurring after Pearson's reinstatement, understanding that the MBTA had not moved for summary judgment on that count.

The district court adopted the magistrate's recommendation in full and granted summary judgment for the MBTA on the three claims considered by the magistrate. After the MBTA moved for summary judgment on the outstanding claim, the district court granted judgment on that, too, finding that Pearson's allegations do not support an inference of racial discrimination. This timely appeal followed.

## II

In this court, Pearson challenges "only the District Court's action [on] the termination itself, and not the post-reinstatement conduct." Appellant's Br. 2 n.1. Our review is accordingly limited to the summary judgment for the MBTA on two of the four claims: that Pearson's discharge constituted racial

discrimination and unlawful retaliation for writing to Senator Kennedy. We review each de novo, Henry v. United Bank, 686 F.3d 50, 54 (1st Cir. 2012), under Fed. R. Civ. P. 56(a) that summary judgment is called for when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

A

Title VII of the Civil Rights Act of 1964 is the authority for the claim of discriminatory termination in its provision that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a). We review the claim under the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Cham v. Station Operators, Inc., 685 F.3d 87, 93-94 (1st Cir. 2012). A plaintiff must establish a prima facie case of discrimination, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000), and if he succeeds, "the burden of production shifts to the defendant to produce evidence 'that the adverse employment actions were taken for a legitimate, nondiscriminatory reason,'" Cham, 685 F.3d at 94 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (internal quotation marks omitted)). "If the defendant produces such evidence, the McDonnell Douglas framework 'disappear[s]' and the sole remaining issue is 'discrimination vel non,'" leaving the

-8-

plaintiff "an opportunity to show that the reasons offered by the defendant were a pretext for discrimination." Cham, 685 F.3d at 94 (quoting Reeves, 530 U.S. at 143) (alteration in original).

We focus only on the final enquiry, for the MBTA offers merely one sentence contesting that Pearson has set out a *prima facie* case, Appellee's Br. 16 n.7 (arguing in the alternative that Pearson's disciplinary history "demonstrates that he was not performing his job at an acceptable level, a necessary element of his prima facie case"), and Pearson implicitly acknowledges that the MBTA has produced some evidence that the discharge was nondiscriminatory, e.g., Appellant's Br. 18 (arguing that the reasons advanced by the MBTA for his discharge were pretextual). We therefore go directly to the ultimate question, whether the MBTA's stated reasons for discharge were pretextual, which at the summary judgment stage is whether the employee "has raised a genuine issue of fact as to whether the termination of [his] employment was motivated by . . . discrimination." Domínquez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 431 (1st Cir. 2000). To defeat summary judgment, Pearson must offer "some minimally sufficient evidence, direct or indirect, both of pretext and of [MBTA's] discriminatory animus." Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 140 (1st Cir. 2012). "[M]ere questions regarding the employer's business judgment are insufficient to raise a triable issue as to pretext." Id.

We read the record as showing that Pearson has not shown a material dispute of fact as to pretext, and thus side with the district court in rejecting the claim that racial discrimination motivated his firing. As the district court found, the MBTA offered a legitimate, non-discriminatory reason for Pearson's termination: that he had been repeatedly insubordinate and had reached the end of the MBTA's progressive disciplinary sequence. As we have often found, insubordination is obviously sufficient to support an adverse employment action. See Windross v. Barton Protective Servs., Inc., 586 F.3d 98, 104 (1st Cir. 2009) (collecting cases).

Pearson responds with the same contentions the district court rejected, describing a series of events that, he argues, amounts to a showing that his firing was pretextual: (1) McCabe (a maintenance supervisor) and Bertozzi (Deputy Director of Signals and Communications) treated him less favorably than white co-workers in imposing discipline with respect to the 2004 and 2006 incidents; (2) Pearson had been active in supporting African-American employees in asserting their civil rights; (3) the MBTA ignored his supervisors' recommendation that he be demoted, not fired; (4) he was left in "employment limbo" for six months after his recommended termination; (5) he was informed that "someone in [l]abor [r]elations" did not like him; (6) the arbitrator did not find just cause for his termination; and (7) it

was unclear who within labor relations made the decision to fire him.  See Appellant's Br. 16-21.

The crux of his claim, therefore, is that a series of questionable acts can establish pretext sufficient to support a discrimination claim, but an examination of the record evidence shows why merely questionable behavior does not get across the line to showing "minimally sufficient evidence" of pretext. Acevedo-Parrilla, 696 F.3d at 140.  The items on Pearson's list that might give one pause fall short for the reasons stated by the district court.  Notably, the white employee alleged to have escaped discipline for the 2006 misconduct had not (unlike Pearson) disobeyed a direct order from a supervisor.  See J.A. 544. Although the 2004 discipline that the MBTA meted out was not similarly applied to a white employee, it was imposed on Pearson by an African-American supervisor and was not imposed against a different African-American employee.  See J.A. 513.  As for the arbitrator's reinstatement decision, it simply means that Pearson should not have been fired because Hagan's directive was ambiguous; there is no intimation that the firing had been motivated by racial animus.  See J.A. 543-44.

It is true that the record does not indicate the person within labor relations who made the decision to convert Pearson's proposed suspension into a recommended termination, but as the district court explained, the supervisors against whom Pearson

-11-

alleges discriminatory motive recommended only a demotion; moreover, Coleman and Donohoe, who were involved in changing the recommendation to a termination, did not know that Pearson was African-American when the recommendation was converted. Finally, the long time that elapsed between Pearson's misconduct and his termination suggests only that the MBTA has a lengthy process for such matters (not to mention the loss of his file along the way), and Pearson does not argue that the MBTA failed to follow its standard drill. We have reviewed Pearson's remaining accusations and find that they do not create a triable issue regarding pretext. The magistrate correctly characterized Pearson's allegations as nothing more than "a disagreement with [MBTA] regarding its disciplinary policies and rule violations," J.A. 544, which cannot defeat summary judgment, see Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (affirming grant of summary judgment where the non-moving party offered only "conclusory allegations, improbable inferences, and unsupported speculation").

B

Pearson next faults the district court's conclusion that the MBTA did not retaliate against him for writing to Senator Kennedy, which would violate Title VII and Massachusetts Chapter 151B. See Appellant's Br. 25-27. To prove a claim of retaliation under either provision, "a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse

-12-

employment action, and (iii) the two were causally linked." Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). Whether summary judgment was proper here turns only on the last element as there is no dispute that writing one's legislator is protected conduct and that being terminated is an adverse employment action. We have rejected claims on this ground when the allegations are "largely conclusory and lacking in the concrete documentation necessary to prove the causal link." Ramos v. Roche Prods., Inc., 936 F.2d 43, 49 (1st Cir. 1991).

The district court correctly held that there was no causal link between Pearson's letter and his termination, the reason being obvious: MBTA officials recommended firing Pearson before he wrote the letter. Causation moves forward, not backwards, and no protected conduct after an adverse employment action can serve as the predicate for a retaliation claim. See, e.g., Sullivan v. Raytheon Co., 262 F.3d 41, 49 (1st Cir. 2001) (rejecting a retaliation claim under Chapter 151B "[b]ecause [the plaintiff's] protected action — filing a charge of discrimination — occurred after the adverse employment action"); Mole v. Univ. of Mass., 814 N.E.2d 329, 340 (Mass. 2004) ("Where, as here, adverse employment actions or other problems with an employee predate any knowledge that the employee has engaged in protected activity, it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are

motivated by retaliation."). Here, to be sure, the decision to terminate had not worked its way to the General Manager, but Pearson points to no evidence that this recommendation would have been rejected if no one at the higher echelon had known of the Kennedy letter. Pearson does argue that Coleman (in the labor relations section) knew of his letter before the day of his termination, and that Coleman's awareness provides the requisite showing of cause. But knowledge alone cannot provide the causal link. "Were the rule otherwise, then a disgruntled employee, no matter how poor his performance or how contemptuous his attitude toward his supervisors, could effectively inhibit a well-deserved discharge by merely filing, or threatening to file, a discrimination complaint." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991).

Finally, Pearson argues that a letter written by Coleman threatening to fire Pearson for insubordination following his reinstatement demonstrates animus that supports an inference that Coleman's prior recommendation was retaliatory. But this is simply too attenuated. More than a year separated these events, and Coleman had a legitimate reason for writing the letter: Pearson had failed to show up for a mandatory appointment (even though it later turned out that Pearson had not been made aware of the meeting). Simply put, we hold that Coleman's post-reinstatement conduct does

not support an inference that Pearson had been fired in retaliation for writing to Senator Kennedy the previous year.

III

The judgment of the district court is affirmed.

*It is so ordered.*