# United States Court of Appeals
## For the First Circuit

No. 22-1356

CARLOS M. RIVERA-VELÁZQUEZ,

Plaintiff, Appellant,

v.

MICHAEL S. REGAN, Secretary of the Environmental Protection
Agency,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raúl Arias-Marxuach, U.S. District Judge]

Before

Barron, Chief Judge,
Hamilton* and Thompson, Circuit Judges.

Maricarmen Almodovar-Diaz for appellant.
Dennise N. Longo Quiñones, with whom W. Stephen Muldrow,
United States Attorney, Mariana E. Bauzá-Almonte, and Francisco A.
Besosa-Martínez, Assistant United States Attorneys, were on brief,
for appellee.

May 9, 2024

---

* Of the Seventh Circuit, sitting by designation.

**BARRON, <u>Chief Judge</u>**.  This appeal concerns a grant of summary judgment to the Administrator for the United States Environmental Protection Agency (the "EPA") on the employment-related claims that Carlos M. Rivera-Velázquez ("Rivera") brings under the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. §§ 701 et seq., and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2001-1 et seq.  We affirm.

**I.**

**A.**

The following facts are not in dispute.  Rivera applied in 2001 for a position as an environmental scientist at the Caribbean Environmental Protection Division (the "CEDP"), which is a component of the EPA.  A military veteran and army reservist until 2013, Rivera was approved for a 10-point preference status in the hiring process on account of his military-service-connected disability of left trapezius myositis, which is a physical impairment.

Rivera was interviewed and hired for the position at CEDP by CEPD's then-Deputy Director José Font and Carlos O'Neil, who was a supervisor at CEPD.  Rivera was hired into a General Schedule 7 ("GS-7") environmental scientist position.  The highest grade in the "career ladder" for this position was GS-12.  Rivera reached that grade in 2004.

Rivera was responsible for enforcement and compliance work related to the National Emissions Standard for Hazardous Air Pollutants ("NESHAPs"), 40 C.F.R. Part 61 et seq.; the Asbestos Hazard Emergency Response Act, 15 U.S.C. § 2641 et seq.; and the Clean Air Act, 42 U.S.C. § 7401 et seq. Throughout his tenure as an environmental scientist at the CEPD, Rivera made it known to his supervisors that he was interested in being promoted to a GS-13 position.

The CEPD was reorganized in 2006 into three branches: the Multimedia Permits and Compliance Branch, into which Rivera's responsibilities fit; the Municipal Waters Programs Branch; and the Resources Conservation and Recovery Act and Remediation Branch. Around the time of the reorganization, Teresita Rodríguez[1] replaced O'Neil as chief of the Multimedia Permits and Compliance Branch and became Rivera's supervisor.

From September 2009 to November 2010, Rivera served a tour of active duty in the U.S. Army and was deployed to Afghanistan. While on active duty, Rivera applied and interviewed for a position as a criminal investigator within the EPA. The position had the potential to be graded GS-13. Rivera was not selected for the position.

---

[1] For purposes of clarity, we use the full names of Teresita Rodríguez and Nancy Rodríguez throughout.

Rivera filed a formal complaint in 2011 with the EPA Office of Civil Rights ("OCR"). He alleged in the complaint that he had been discriminated against in the hiring process in violation of the Rehabilitation Act. In that regard, he alleged that the interviewers, who were from the New York EPA office, expressed concern about whether his myositis disability would affect his ability to complete the training that was a requirement for the position.

The OCR issued a final decision with respect to the 2011 complaint on December 17, 2012. The OCR determined in that decision that there was no merit to Rivera's complaint because he had failed to establish a prima facie case of disability discrimination under the Rehabilitation Act.

After Rivera had returned to CEPD following his tour of duty in Afghanistan, Teresita Rodríguez began checking in on his well-being. She asked about his family life and how he was adjusting to his return to civilian life. In August 2012, the United States Veteran's Administration diagnosed Rivera with Post-Traumatic Stress Disorder ("PTSD") related to his military service in Afghanistan.

Teresita Rodríguez was Rivera's manager until 2011. Thereafter, she became the Acting Deputy Director of the CEPD. After Teresita Rodríguez took on this new position, several

individuals oversaw the Multimedia Permits and Compliance Branch for rotating, 120-day periods until Nancy Rodríguez was selected as the permanent chief of the Branch in June of 2014.

Shortly after Nancy Rodríguez took on her new duties, Rivera and a co-worker raised concerns that Nancy Rodríguez was not qualified to supervise work related to the Clean Air Act. Nancy Rodríguez testified that at times she felt threatened by Rivera because she "was not sure how he would react during . . . meetings"; that, accordingly, she rarely met with him one-on-one; and that when they did meet alone, she would ask other supervisors to "check on her" because she was worried about what might happen.

**B.**

Rivera complained repeatedly -- and in a variety of fora -- about the treatment that he had received both from Nancy Rodríguez after she became the chief of the Branch and from his other supervisors at CEPD, including Font. Many of those complaints were informal and regarded a range of what Rivera contended was mistreatment that he characterized at various times as harassment and as having created a hostile work environment. But he also lodged some formal complaints about how he had been treated by his supervisors.

Rivera made the first of these formal complaints on September 25, 2014. Rivera did so by filing a grievance through

the union that represented his bargaining unit at the CEPD. He alleged in the grievance that Nancy Rodríguez had called him on his personal cellular phone while he was on sick leave in violation of the operative collective bargaining agreement. Rivera then filed a second grievance through the union on October 2, 2014. He alleged in this grievance that Nancy Rodríguez and Font were creating a "hostile work environment" and impeding his ability to advance in his career in violation of the collective bargaining agreement.

On March 8, 2017, Rivera sought guidance from Barbara Pastalove, the Chief of Human Resources for EPA Region 2, which includes Puerto Rico. Rivera sought guidance about his right to request, pursuant to EPA Order 4711, an investigation into workplace "harassment" by Nancy Rodríguez.

On March 14, Rivera, through Pastalove, presented a claim of "harassment" for investigation pursuant to EPA Order 4711. In the claim, Rivera alleged that Nancy Rodríguez had been creating a "hostile work environment" since 2014 and that Teresita Rodríguez and Font had supported Nancy Rodríguez in doing so. Specifically, Rivera alleged that Nancy Rodríguez had regularly dismissed his professional input, excluded him from meetings and other communications, and imposed training requirements on him that differed from those applied to other inspectors in the branch.

In April of 2017, Carmen Guerrero, then-CEPD's Director and the decision maker on Rivera's EPA Order 4711 complaint, imposed several "interim measures . . . while the factfinding and decision[-]making process under EPA Order 4711 [were] ongoing." These measures included Rivera reporting to Jaime Géliga, the Branch Chief of the Municipal Waters Programs Branch, and Rivera and Nancy Rodríguez abstaining from direct communication. Thereafter, throughout 2017, Nancy Rodríguez remained Rivera's official supervisor and he remained an inspector in the Air Division. Rivera's work assignments, however, were conveyed to him via Géliga, to whom Rivera reported on a day-to-day basis.

On April 21, 2017, Rivera filed a second formal complaint with the EPA's OCR. In this complaint, he alleged that, in violation of the Rehabilitation Act and Title VII, Nancy Rodríguez had discriminated against him based on his service-connected disability and retaliated against him for his prior protected activity. The conduct at issue in this OCR complaint was substantially the same as the conduct that Rivera had identified in his request for an EPA Order 4711 investigation the prior month.

In December 2017, however, Rivera amended this OCR complaint in relation to his having received a "minimally satisfactory" rating on his 2017 year-end performance assessment. Rivera's request to amend the OCR complaint also resulted in a

second investigation pursuant to EPA Order 4711. This investigation, which began in January 2018, concerned his allegations pertaining to the 2017 performance assessment.

In January 2018, Guerrero received the factfinding report from the 2017 EPA Order 4711 investigation into Rivera's allegations of "harassment" unrelated to the 2017 performance assessment. The report included over 50 exhibits as well as interviews with Rivera and other witnesses. Guerrero concluded that there was no evidence that there had been harassment of Rivera by Nancy Rodríguez, Teresita Rodríguez, or Font. Guerrero informed Rivera of this decision on June 11, 2018. Then, on July 13, 2018, Rivera was informed that the decisionmaker in the EPA Order 4711 investigation into his allegations pertaining to the 2017 performance assessment did not find any evidence of harassment or retaliation in relation to Rivera's 2017 performance assessment.

The OCR issued its Final Agency Decision regarding Rivera's 2017 OCR complaint on April 16, 2018. The decision concluded that Rivera failed to prove either a violation of Title VII or a violation of the Rehabilitation Act.

Rivera filed a third formal complaint with the EPA's OCR on September 17, 2018. In that complaint, Rivera alleged that, in violation of the Rehabilitation Act and Title VII, he was retaliated against by Guerrero, then the Director of the CEPD;

Géliga, who had been supervising Rivera since April of 2017; and the decisionmaker for the second EPA Order 4711 investigation. A final decision on this complaint does not appear to be included in the record.[2]

## C.

During this period of friction between Rivera and his supervisors, they took various actions towards him. For example, in both 2014 and 2017 Rivera received a "minimally satisfactory" rating on one of the elements of a periodic professional assessment conducted by CEPD. However, on both occasions, Rivera was ultimately given a "fully successful" rating because he had not been placed on a performance assistance plan prior to the assessment, as the collective bargaining agreement for his bargaining unit required before an employee in that unit could be given a "minimally satisfactory" rating.

Additionally, on October 1, 2014, CEPD management sent a referral to the EPA's Office of Inspector General ("OIG") to investigate whether Rivera had violated various federal criminal statutes as well as agency rules by intentionally misrepresenting

---

[2] The Administrator has not invoked Rivera's failure to exhaust the claims made in this complaint as a basis for affirming the District Court's grant of summary judgment. Cf. Nunnally v. MacCausland, 996 F.2d 1, 2-4 (1st Cir. 1993) (noting that federal employees must administratively exhaust Rehabilitation Act claims before filing suit).

that he was adequately trained and credentialed to conduct NESHAPs and Clean Air Act inspections. The OIG ultimately concluded that Rivera did not make any actionable misrepresentations. Rivera was nonetheless temporarily removed from certain projects while the OIG investigation was pending.

Then, in August 2018, Rivera was prevented from participating in a Visible Emissions recertification training. Rivera had sought preapproval to travel to Texas for the training after he had not participated in the training when it was offered in July in Puerto Rico. However, at Guerrero's instruction, Géliga, as Rivera's acting supervisor, did not approve Rivera to travel to Texas for the training. Completion of the training was a requirement for Rivera to perform his duties as an inspector under the Clean Air Act.

Around this time, but after Guerrero had informed Rivera of the outcome of her investigation into his claim of harassment pursuant to EPA Order 4711, she also stated that he would continue to report to Géliga while Nancy Rodríguez remained his formal supervisor. Guerrero informed Rivera, however, that he would report to Géliga only through September 30, 2018. Guerrero also offered Rivera the option of accepting a lateral transfer to either the Municipal Waters Programs Branch under Géliga's supervision, or to the Resources Conservation and Recovery Act and Remediation

Branch under Teresita Rodríguez's supervision. Guerrero informed Rivera that if he did not want to transfer, he would return to reporting to Nancy Rodríguez. Rivera opted to transfer to the Municipal Waters Programs Branch, effective October 4, 2018.

Finally, in May of 2020, Rivera applied for a temporary GS-13 air inspector position. A few weeks after he submitted his application, however, the posting was cancelled. An EPA Human Resources employee sent an email to Rivera and the three other people who had applied for the position. The email informed Rivera and the other three applicants that the position had been cancelled due to the COVID-19 pandemic and "the subsequent pause on some EPA field work/inspections."

**D.**

On January 1, 2019, Rivera filed the operative complaint, which set forth employment discrimination claims against the EPA Administrator under the Rehabilitation Act and Title VII.[3] On March 4, 2021, the Administrator moved for summary judgment as to Rivera's claims. The Administrator also moved on May 26, 2021, to strike an affidavit that Rivera had filed in his opposition to the Administrator's summary judgment motion.

---

[3] Andrew Wheeler was the acting Administrator of the EPA when Rivera initially filed suit. Michael Regan was sworn in as Administrator on March 11, 2021, and we automatically substituted him as the appellee. See Fed. R. App. P. 43(c)(2).

The District Court granted summary judgment to the Administrator on Rivera's claims and struck the affidavit. Rivera-Velázquez v. Wheeler, No. 18-CV-1751, 2022 WL 993643, at *24 (D.P.R. Mar. 31, 2022). Rivera then timely filed this appeal.

## II.

Although Rivera brought claims under both Title VII and the Rehabilitation Act, and although the District Court granted summary judgment to the Administrator on all the claims that Rivera brought under those statutes, the only portion of the grant of summary judgment on the Title VII claims that Rivera challenges in this appeal pertains to his claims for retaliation. Before addressing Rivera's challenges regarding his retaliation claims under both that statute and the Rehabilitation Act, however, we consider his challenges to the grant of summary judgment on his other Rehabilitation Act claims. In these claims, he alleges mistreatment by CEPD employees because of their perception that he had a disability, namely PTSD.

## A.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity . . . conducted by

any Executive agency." 29 U.S.C. § 794(a).[4] To succeed in opposing the Administrator's summary judgment motion as to his non-retaliation-based Rehabilitation Act claims, Rivera first had to meet his burden with respect to whether he had established a prima facie case as to the claims. See Mancini v. City of Providence by and through Lombardi, 909 F.3d 32, 38 (1st Cir. 2018) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973)). Accordingly, even with respect to his hostile-work-environment-based Rehabilitation Act claim, Rivera had to put forth evidence from which a reasonable juror could find that "1) [he] was disabled within the meaning of the statute; 2) [he] was qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and 3) the [CEPD] took adverse action against [him] because of the disability." Ríos-Jímenez v. Principi, 520 F.3d 31, 41 (1st Cir. 2008) (citation omitted); see McDonough v. Donahoe, 673 F.3d 41, 49-50 (1st Cir. 2012) ("Because the first step in any claim under the Rehabilitation Act is establishing a disability covered by the Act and McDonough has

---

[4] Although Rivera, as an employee of a federal agency, brings his claims under the Rehabilitation Act rather than the Americans with Disabilities Act ("ADA"), "the liability standards are the same under each statute," Quiles-Quiles v. Henderson, 439 F.3d 1, 5 (1st Cir. 2006), and "the case law construing the ADA generally pertains equally to claims under the Rehabilitation Act," Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 19 (1st Cir. 2004).

failed to show that she was disabled, her hostile work environment claim must fail.").

A plaintiff can show that he was "disabled" within the meaning of the Rehabilitation Act in various ways. The plaintiff can do so by showing that he had an actual disability, which is "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1); that he had a record of disability, which is "a record of" "a physical or mental impairment that substantially limits one or more major life activities," id.; or that he was "regarded as having" "an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity," id. at §§ 12102(1)(C), 12102(3)(A); see also 29 U.S.C. § 705(9)(B) (providing that the term disability as used in the Rehabilitation Act has "the meaning given it in [the ADA, 42 U.S.C. § 12102]").

In opposing the Administrator's motion for summary judgment on the non-retaliation-based Rehabilitation Act claims, Rivera identified several specific employment actions that he claimed that Nancy Rodríguez and Teresita Rodríguez had taken against him in violation of the statute because they "regarded [him] as" having a disability, namely PTSD.[5] Rivera also claimed

---

[5] Because the specific details of the asserted adverse actions "have no bearing on the final outcome, we need not discuss the specifics." McDonough, 673 F.3d at 46 n.8.

- 14 -

that his supervisors violated the Rehabilitation Act by subjecting him to a "hostile work environment" because they "regarded [him] as" having a disability.

The District Court determined, however, that Rivera had failed to put forth evidence that permitted a reasonable factfinder to determine that he was disabled within the meaning of the Rehabilitation Act on any of the grounds for so determining,[6] and so had failed to establish the first element of a prima facie case. Rivera-Velázquez, 2022 WL 993643, at *17–19.  On that basis, the District Court granted summary judgment to the Administrator on all of Rivera's non-retaliation-based Rehabilitation Act claims. Reviewing de novo, while considering "the evidence in the light most agreeable to [Rivera], giving [him] the benefit of any and all reasonable inferences," Murray, 789 F.3d at 25 (citation omitted), we agree with the District Court's decision.

---

[6] The District Court's exact language was that Rivera "failed to show" that he was disabled. Rivera-Velázquez, 2022 WL 993643, at *18.  In analyzing this claim, the District Court did not expressly refer to the summary judgment standard or explain that Rivera could make a prima facie showing by pointing to evidence in the record that, if unrebutted, could support a reasonable juror's inference in his favor on each element of his claim. See Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 253 (1981). However, the District Court's analysis was entirely consistent with the application of the proper standard, and in any event, our review is de novo. Murray v. Kindred Nursing Ctrs. W. LLC, 789 F.3d 20, 25 (1st Cir. 2015).

**B.**

Rivera does not dispute that there is no basis for finding him disabled on the ground that he had "a physical or mental impairment that substantially limits one or more major life activities" or that the defendants possessed a record of his having such an impairment. 42 U.S.C. § 12102(1). His challenge on appeal thus focuses on the District Court's ruling that Rivera had not met his burden to "show that CEPD management 'regarded him as disabled.'" In so ruling, the District Court noted that "Nancy Rodríguez testified" that at the relevant times "she was not aware [Rivera] had a medical condition that may affect him" and that Rivera admitted that none of his supervisors "ever made comments alluding to him being mentally disabled, or that he was unreliable due to mental instability." Rivera-Velázquez, 2022 WL 993643, at *18. The District Court also concluded that Nancy Rodríguez's and Teresita Rodríguez's behavior towards Rivera, as reflected in the record, was "insufficient to show that Rivera['s] employers 'regarded [him] as disabled' nor 'that he was perceived as unfit for a broad range of jobs as a result of his mental condition.'" Id. (quoting Acevedo v. Potter, No. 08-1468, 2011 WL 7092592, at

- 16 -

*9 (D.P.R. Mar. 23, 2011), aff'd sub nom. Acevedo v. Donahoe, 448 F. App'x 78 (1st Cir. 2012)).[7]

Rivera argues that the District Court erred in so ruling, as he contends that he has put forth evidence from which a reasonable juror could find that Nancy Rodríguez and Teresita Rodríguez regarded him as having PTSD. Rivera does not contend that there is any direct evidence that either Nancy Rodríguez or Teresita Rodríguez knew he suffered from PTSD. Instead, Rivera points to evidence in the record that Teresita Rodríguez stated that she was worried that he had reported back to work so quickly after returning from Afghanistan; inquired whether he "might need . . . to take a break or some time out"; and asked him questions like, "How are you feeling today? Do you want to take some time off? Everything OK with the family? With the kids? With your wife?" Teresita Rodríguez also stated in a deposition that Rivera "demonstrate[d] that he needed [extra] attention" upon his return from Afghanistan and that she believed "it was the result of him having come back to his family, to the work area."

_____

[7] We emphasize that Rivera was not required to show that his supervisors regarded him "as unfit for a broad range of jobs as a result of his mental condition," Rivera-Velázquez, 2022 WL 993643, at *18, to satisfy his burden to show that he was regarded as having a disability. See Mercado v. Puerto Rico, 814 F.3d 581, 587 (1st Cir. 2016).

In addition, Rivera argues that a juror could reasonably find that Nancy Rodríguez regarded him as having PTSD based on the evidence in the record. Specifically, Rivera points to the evidence in the record that she told the OIG investigator that she perceived Rivera as "aggressive," "felt threatened and/or intimidated by him," "was not sure how he would react during . . . meetings," and, accordingly, rarely met with him one-on-one. She further told the OIG investigator, Rivera notes, that when she did meet with Rivera one-on-one, she would ask other supervisors to "check on her" because she was worried about what might happen.[8]

The District Court acknowledged all the evidence that concerned the conduct and comments by Teresita Rodríguez and Nancy Rodríguez that Rivera highlights on appeal. The District Court nonetheless concluded that this evidence, even when considered in combination, did not suffice to show that either of these two supervisors regarded Rivera as having PTSD. In this regard, the District Court explained that "'[a] supervisor's expression of concern for an employee's health or wellbeing does not necessarily mean that the supervisor—and by extension, the employer—regards the employee as having an impairment.'" Rivera-Velázquez, 2022 WL

---

[8] To the extent Rivera claims that Font contributed to an allegedly discriminatory hostile work environment, Rivera does not make any argument that there is evidence supportably showing that Font regarded him as disabled.

993643, at *18 (quoting Saffer v. Bechtel Marine Propulsion Corp., No. 19-cv-25, 2020 WL 5363322, at *6 (W.D. Pa. Sept. 8, 2020)). In addition, the District Court explained that neither of the two supervisors "ever made comments alluding to [Rivera] being mentally disabled, or that he was unreliable due to mental instability." Id.

In arguing that the District Court erred in so ruling, Rivera first contends, with respect to Nancy Rodríguez, that "[h]er 'accumulated myths and fears' and stereotyping of Rivera impacted on the manner she related to him as supervisor to such an extent that" she avoided meeting with him individually. Rivera attempts to support this contention by quoting a passage from School Board of Nassau County, Florida v. Arline. See 480 U.S. 273, 284 (1987) ("[S]ociety's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment."). But Rivera fails to identify any evidence to support the conclusory assertion that Nancy Rodríguez's behavior was based on disability-based "myths and fears" and "stereotyping," and Arline does not itself suggest that a record such as this one suffices to show that an employer was relying on "myths and fears" and "stereotyping" of that problematic kind.

Rivera separately asserts that the District Court's ruling cannot stand because the District Court ignored the evidence described above and instead simply credited Nancy Rodríguez's statement that she did not know about Rivera's PTSD diagnosis. But that is not an accurate account of the District Court's reasoning. As we have explained, the District Court referred to the instances highlighted by Rivera as evidence of Nancy Rodríguez's regarding him as having PTSD before determining that those instances "[were] insufficient to show that Rivera['s] employers 'regarded [him] as disabled[.]'" Rivera-Velázquez, 2022 WL 993643, at *18. There is no basis for concluding, therefore, that the District Court overlooked any of this evidence.

Finally, Rivera asserts that "a factual dispute exists as to whether [his] supervisors regarded [him] as having a mental disability." But Rivera develops no argument, nor cites to any authority, in support of that conclusory assertion. And his failure on that score is particularly significant because the U.S. Equal Employment Opportunity Commission's interpretive guidance for the "regarded as" definition of "disabled" notes the importance of "distinguish[ing] between conditions that are impairments and physical, psychological, environmental, cultural, and economic characteristics that are not impairments," and instructs that the definition "does not include common personality

- 20 -

traits such as poor judgment or a quick temper where these are not symptoms of a mental or psychological disorder." 29 C.F.R. Pt. 1630, App.

For these reasons, we conclude that there is no merit to Rivera's challenge to the District Court's ruling that Rivera failed to meet his burden to satisfy the first element of his prima facie case with respect to his Rehabilitation Act claims predicated on his having been regarded as having a disability. For, while the requisite showing may be made by circumstantial evidence that permits reasonable inferences, Rivera identifies no direct evidence that either Nancy Rodríguez or Teresita Rodríguez knew, at the relevant times, that Rivera had been diagnosed with PTSD and the evidence in the record on which Rivera relies to make his case would require "unsupported speculation" as to what was in the minds of the supervisors when they made the comments that they made and acted towards him as they did. Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013) (quoting Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013)). Accordingly, we reject Rivera's challenge to the grant of summary judgment to the Administrator as to these claims.

## III.

There remains to address Rivera's challenge to the District Court's grant of summary judgment to the Administrator on

Rivera's retaliation claims under both the Rehabilitation Act and Title VII. The Rehabilitation Act "prohibits retaliation against employees for complaining about violations of the Act." Quiles-Quiles, 439 F.3d at 8. Similarly, Title VII prohibits retaliation for "any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). We begin with Rivera's Rehabilitation Act-related challenge before turning to his Title VII-related one.

## A.

To prevail on his retaliation claims under the Rehabilitation Act, Rivera needs to show as to each that he: "(1) was engaged in protected conduct; (2) suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action." Colón-Fontánez v. Municipality of San Juan, 660 F.3d 17, 36 (1st Cir. 2011). And to survive summary judgment on the claims, Rivera must make out a prima facie case of retaliation as to each claim by pointing to evidence in the record that could support each of the three elements of such a prima facie case. See Ponte v. Steelcase Inc., 741 F.3d 310, 321 (1st Cir. 2014).

As to the "protected conduct" element, we understand Rivera to be relying on appeal on the evidence of his having engaged in the following discrete instances of protected conduct:

- 22 -

the formal OCR complaints that he filed in 2011, 2017 and 2018; the claims of "harassment" that led to the "two EPA Order 4711s, initiated on March 14, 2017 and January 12, 2018 respectively," Rivera-Velázquez, 2022 WL 993643, at *19; and his "[i]nformal protests of discriminatory employment practices such as complaining to management, 'writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal [charges,]'" id. (quoting Garcia-Garcia v. Costco Wholesale Corp., 878 F.3d 411, 425-26 (1st Cir. 2017)). We also understand Rivera to be relying on the evidence of the grievances that he filed through his union in 2014 about his alleged mistreatment by Nancy Rodríguez and Font.

As to the "adverse employment action" element, Rivera relies on appeal on evidence of a variety of discrete actions taken by his supervisors at CEPD. Those actions were that the supervisors: (1) failed to promote him to a GS-13 position through a noncompetitive process;[9] (2) de facto demoted him by "forc[ing]" him to transfer to the Municipal Waters Programs Branch; (3)

_____

[9] The District Court also addressed the fact that Rivera requested a desk audit in 2016 to determine whether his current position was properly graded as GS-12. Rivera-Velázquez, 2022 993643, at *11. Rivera does not argue on appeal that the desk audit decisionmaker's conclusion that Rivera's position was properly graded constitutes an adverse action.

- 23 -

cancelled a temporary GS-13 position for which he had applied in 2020; (4) prevented him from completing a Visible Emissions training; and (5) initiated an OIG investigation against him. We note that Rivera's briefing on appeal also alludes to other actions by his supervisors, such as some of the conduct that grounds his hostile work environment claim. But he has failed to develop, both below and on appeal, any argument that any of these actions, whether considered individually or collectively, constituted an adverse action for purposes of the retaliation claims, let alone how any of these actions not only rises to the level of constituting an adverse action but also has a causal link to any specific protected conduct that he identifies. Thus, any such argument is waived. See United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals."); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Finally, as to the "causation" element, Rivera relies on appeal primarily on what he contends is sufficient evidence of temporal proximity between the protected conduct that he identifies and the adverse action that grounds each of his claims

of retaliation.  See Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994) ("One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action.").  But he also appears to rely on evidence that he contends suffices to show that his supervisors' stated reasons for certain of the adverse actions were pretextual.

Reviewing the District Court's decision de novo, see Murray, 789 F.3d at 25, we conclude that Rivera has failed to establish a prima facie case for his retaliation claims under the Rehabilitation Act.  We thus conclude that there is no merit to his challenge to the grant of summary judgment to the Administrator with respect to Rivera's retaliation claims under that statute.  To explain that conclusion, we examine, with respect to each of the claimed adverse actions, whether Rivera has made out a prima facie case of retaliation under the Rehabilitation Act.

**1.**

We start with Rivera's attempt to ground his prima facie case of retaliation on the allegation that his supervisors at CEPD took an adverse action against him in retaliation for his protected conduct by failing to promote him to a GS-13 position.  Rivera asserts that the District Court erred in concluding that this attempt to ground his prima facie case failed, see Rivera-

- 25 -

Velázquez, 2022 WL 993643, at *19 (citing Velez v. Janssen Ortho, LLC, 467 F.3d 802, 807 (1st Cir. 2006)), because the District Court failed to address his argument that the refusal of his supervisors to promote him to that position inhered in their refusal to create a GS-13 position for him in the first place.

To support this contention, Rivera asserts that EPA regulations allow supervisors to create positions for employees deserving of merit-based promotions. He then contends that his supervisors retaliated against him by failing to "trigger[] the available EPA[] Merit Promotion Regulations designed to recognize and retain employees that have exceeded the employer's expectations." The District Court concluded, however, that no reasonable juror could find on this record that Rivera's supervisors had the power to create a GS-13 position just for him. We agree. We thus reject this ground for reversal, even assuming that Rivera is correct in arguing that his supervisors' failure to create the GS-13 position for him in and of itself constituted an adverse action.

As the District Court noted, Font, Nancy Rodríguez, and Teresita Rodríguez all testified to not having "the authority to promote [Rivera] or single-handedly create a GS-13 position for him," Rivera-Velázquez, 2022 WL 993643 at *21, and Rivera does not point to any regulation in the record that would have allowed them

- 26 -

to create such a position for him.  Moreover, Pastalove, the Chief of Human Resources for EPA Region 2, which includes Puerto Rico, stated in her unrebutted testimony that before a GS-13 position could be created for a merit promotion, "[t]here would be consultation with Human Resources" and "big-picture discussions about where [within CEPD the position] should be located." Pastalove explained in her testimony that the "selecting official" in consultation with other decisionmakers would have "identified the selection criteria . . . for eligibility[] to apply for the job," and that those criteria would be announced so that those who met the criteria could apply.  Pastalove added in her testimony that candidates cannot be "pre-selected" for merit promotions but must apply for a promotion to a position once it is posted.  She testified too, that a supervisor cannot create a GS-13 position simply because the supervisor is of the view that an employee deserves a GS-13 promotion.

In attempting to show that there is nonetheless a genuine issue of material fact in the relevant respect, Rivera points first to what he contends is evidence of his supervisors' varying explanations for his not having been promoted to a GS-13 position. He emphasizes that none of those explanations concerned the supervisor lacking the authority to have created such a position for him.  For example, Rivera asserts that Teresita Rodríguez told

him that he needed more training before he could be promoted to a GS-13 position but that she later said that "she would only consider recommending his promotion if[] Nancy Rodríguez recommended it" and if he stopped complaining about Nancy Rodríguez.

Rivera's account of Teresita Rodríguez's comments regarding whether she would "recommend" Rivera for a promotion into an available position, however, is not inconsistent with either Pastalove's explanation of the merit-promotion process or the testimony by Rivera's supervisors that they could not create a GS-13 position for him. So, we do not see how the evidence of the comments by Teresita Rodríguez suffices to a create a genuine dispute about whether Rivera's supervisors did have the authority to create a GS-13 position for him in the manner that he contends they did. Moreover, Rivera does not assert that, insofar as the adverse action to which he was subjected constituted a refusal to promote him to a GS-13 position, the refusal took the form of denying him a promotion to a GS-13 position that existed and to which he had applied. Rather, he contends that refusal took the form of his supervisors refusing to create such a position for him. Thus, the evidence that he identifies about the reasons that his supervisors gave for not recommending him for a promotion do not advance his cause, as that evidence could not supportably show

that Rivera's supervisors had the authority to create such a position.

Rivera does separately point to an unsworn declaration by Francisco Claudio, who worked with Rivera in the Compliance and Enforcement Branch of the CEPD.  The declaration states that on an unspecified date Claudio "was granted the GS-13 level through a merit increase process" that "was not competitive" and that Claudio believed there were "EPA employees in New York that perform the same duties but with less years of experiences than . . . Rivera, that [were] classified as GS-13."  But this declaration makes representations about Claudio's beliefs regarding employees in a different EPA office and his understanding of the process through which he was promoted being "not competitive."  And we do not see how representations about the New York Office provide a basis from which a reasonable juror could infer that Rivera's supervisors <u>in Puerto Rico</u> could create a GS-13 position just for him.  Nor do we see how Claudio's representations about his own promotion provide any basis for concluding that the supervisors could have created the position that Rivera claims that they could have at the time that Rivera alleges that his supervisors were retaliating against him.  <u>Cf.</u> <u>González-Bermúdez</u> v. <u>Abbott Lab'ys P.R. Inc.</u>, 990 F.3d 37, 47-48 (1st Cir. 2021) (retaliatory failure-to-promote plaintiff could not rely on the fact that other employees were

"offered promotions without having to compete with external candidates" where policy regarding external competition changed a few months before the period during which the plaintiff alleged retaliation).

Thus, based on the arguments that Rivera has made to us, we cannot say the District Court erred in ruling that Rivera failed to meet his burden to establish a prima facie case insofar as Rivera sought to do so based on his having been denied a GS-13 promotion by his supervisors' failure to create a GS-13 position for him. If he is to show that the District Court erred in ruling that he had failed to make a prima facie case of retaliation under the Rehabilitation Act, therefore, he must identify some other adverse action to ground it.

## 2.

Rivera does argue that, contrary to the District Court's ruling, he made out a prima facie case of retaliation in violation of the Rehabilitation Act based on the evidence in the record that he contends supportably shows that he "was forced to accept a transfer to the [Municipal] Water[s Programs] Division with significantly different responsibilities that was less conducive to career advancement." Rivera appears to be referring to the choice Guerrero gave him, after concluding her investigation into his EPA Order 4711 complaint of "harassment," between transferring

to one of the other branches of CEPD or returning to Nancy Rodríguez's supervision.

Rivera does characterize his transfer to the Municipal Waters Programs Branch as his having been "forced" into a "de facto demotion." The undisputed record shows, however, that Guerrero stressed that Rivera "had no obligation" to accept a transfer. Rivera nonetheless asserts that the "choice" was a false one because "being supervised by Nancy Rodríguez was not an option given the history of harassment, retaliation and discrimination." But he fails to develop any argument that, because of that history, requiring him to continue to work for Nancy Rodríguez would itself have constituted a retaliatory adverse action.

Thus, we do not see how Rivera has put forth evidence from which a reasonable juror could find that he was subjected to an adverse action when Guerrero presented him with the option of taking a position in the Municipal Waters Programs Branch.[10]  Cf. Torrech-Hernández v. Gen. Elec. Co., 519 F.3d 41, 50 (1st Cir.

_____

[10] Rivera also states in the facts section of his brief that he "was disqualified to continue his work at the Air Division" because he was unable to complete his Visible Emissions training. He does not point, however, to any facts in the record that supportably show that he could not have remained there while he waited to recertify. In any event, we conclude below that he has failed to identify record support from which a reasonable juror could find that the cancellation of this Visible Emissions training constituted an adverse action that was linked to any protected conduct.

2008) ("[I]n order for a resignation to constitute a constructive discharge, it effectively must be void of choice or free will."). And this conclusion draws further support from the fact that, as the Administrator notes, Rivera admitted that in October 2016 he had requested a reassignment to the Municipal Waters Programs Branch because he believed the move would improve his "career ladder opportunities."

### 3.

Rivera also argues that, contrary to the District Court's ruling, he has made out a prima facie case of retaliation under the Rehabilitation Act based on his having applied, along with three other people, for a temporary GS-13 air inspector position in early 2020 that was cancelled within two weeks of his having submitted his application. In fact, Rivera contends, the District Court failed to address the cancellation of that position, which he argues was an adverse action taken in retaliation against him. We may affirm the District Court's grant of summary judgment "on any ground made manifest in the record," however. Am. Steel Erectors v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 815 F.3d 43, 63 (1st Cir. 2016). And Rivera makes no argument as to how a juror could reasonably find a causal nexus between the cancellation of the position and any of his protected conduct.

In that regard, we note that the record shows that he made the last of his formal complaints about mistreatment by his supervisors -- whether through the filing of complaints with the OCR or the presentation of claims pursuant to EPA Order 4711 -- in 2018. In other words, he did so years before the cancellation of the relevant GS-13 position. Thus, there is no basis for inferring causation based on a temporal link between this claimed adverse action and any of those protected activities. See Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) ("Without some corroborating evidence suggestive of causation" even a "gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action."). Nor does Rivera identify any other evidence that could support such a link.

Rivera also develops no argument as to how any of his informal complaints constituted not only protected conduct but also protected conduct that caused the cancellation of the position in 2020. So, any such argument is waived. See Zannino, 895 F.2d at 17.

**4.**

Rivera's attempt to ground his prima facie case of retaliation on the initiation of the 2014 OIG investigation into

his credentials similarly fails.[11]  The District Court ruled that there was no basis for inferring that CEPD management's referral of Rivera to the OIG for investigation was in retaliation for the only formal complaint about his supervisors' conduct that he made before the OIG investigation.  And we agree, given the three-year time lag between the OIG referral and Rivera's 2011 complaint, as well as Rivera's failure to identify any basis other than temporal proximity for connecting the OIG referral to his protected activity.  See Ahern, 629 F.3d at 58.  Nor is there any basis -- quite obviously -- for inferring that the OIG referral was spurred by the 2017 and 2018 complaints that Rivera filed under EPA Order 4711 and with OCR, given that he filed those complaints years after the OIG referral occurred.  See Pearson v. Massachusetts Bay Transp. Auth., 723 F.3d 36, 42 (1st Cir. 2013)

---

[11] Rivera is correct that the District Court erred insofar as it granted summary judgment to the Administrator on the ground that none of the alleged adverse actions altered the terms or conditions of Rivera's employment.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64 (2006) (so holding in the context of Title VII retaliation); Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 20 (1st Cir. 2006) (holding, per Burlington Northern, that an adverse action for purposes of a claim of retaliation under the Rehabilitation Act is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (quoting Burlington N., 548 U.S. at 68)).  However, this error does not preclude us from affirming the District Court's alternative basis for granting summary judgment -- Rivera's failure to show any causal connection between the initiation of the OIG investigation and any protected conduct in which he had engaged.

("Causation moves forward, not backwards, and no protected conduct after an adverse employment action can serve as the predicate for a retaliation claim.").

Insofar as Rivera means to argue that he may rest his prima facie case on the OIG referral because it occurred on October 1st of 2014 and he had filed a union grievance against Nancy Rodríguez on September 25th of that year, we similarly see no basis for overturning the District Court's ruling against him. Rivera understandably emphasized at oral argument that the two events occurred close in time.[12] But, as the Administrator pointed out in a post-argument 28(j) letter, the September 25 union grievance did not attempt to identify any discriminatory conduct prohibited under the Rehabilitation Act. And, in response to that letter, Rivera agreed that was the case. Thus, because protected conduct is limited "to action taken to protest or oppose statutorily prohibited discrimination," the union grievance cannot be the adverse action grounding the asserted prima facie case of retaliation under the Rehabilitation Act. Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) (citation omitted).

---

[12] Rivera also refers to a second union grievance filed on October 2, 2014. However, that grievance was filed after the OIG referral was made on October 1, 2014. See Pearson, 723 F.3d at 42.

Finally, we do not see how Rivera can show that he satisfied the causation element of the prima facie case with respect to the OIG referral based on his informal complaints. And that is because Rivera fails to argue, with respect to any specific informal complaint, that it constituted protected conduct and that the OIG referral was made with sufficient temporal proximity to it to give rise to an inference of causation. See Zannino, 895 F.2d at 17. Thus, even if Rivera were right in arguing that the record supportably shows that Font and Teresita Rodríguez "insisted on referring Rivera to the OIG despite knowing that he had 90 [percent] of the credentials and . . . had not engaged in any fraudulent actions," his challenge still would lack merit, as he fails to identify any causal link between the decision to refer him to the OIG and any protected conduct -- whether undertaken formally or informally -- in which he engaged. Cf. Theidon v. Harvard Univ., 948 F.3d 477, 496 n.29 (1st Cir. 2020) ("Pretext and discriminatory animus are often lumped together in Title VII analysis, but the plaintiff's burden at this stage comprises two separate tasks.").

**5.**

Rivera makes one last argument as to why we must conclude that the District Court erred in ruling that he had not met his burden to establish a prima facie case of retaliation under the

Rehabilitation Act. Here, he relies on what the record shows with respect to the cancellation of his Visible Emissions training in August 2018.

The District Court noted that, with respect to the cancellation of that training, "the closest protected activity . . . would be his 2017 EEO Complaint filed on April 21, 2017." Rivera-Velázquez, 2022 WL 993643, at *24. But Rivera filed that complaint more than a year before he was not approved for the training. Thus, there is no basis for inferring a causal link between the two based on timing alone. See Ahern, 629 F.3d at 58. Rivera also develops no other argument for linking the cancellation of the Visible Emissions training to any of the protected conduct in which he engaged.

Rivera does argue that the cancellation of his Visible Emissions training can nonetheless ground a prima facie case of retaliation under the Rehabilitation Act. He contends that is so because of the cancellation's temporal proximity to the email from Guerrero on June 11, 2018, that informed Rivera that Guerrero had concluded the investigation of Rivera's 2017 complaint under EPA Order 4711 and found no merit to it. Rivera does not offer any argument, however, as to why Guerrero's sending of the email should be the relevant starting point from which to calculate temporal proximity. And Rivera's failure to offer any such argument is

concerning given that the relevant time span for determining temporal proximity is between when an employer learns of protected activity and when an adverse action is taken.  See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (characterizing as "implausible" the suggestion that the date of "the EEOC's issuance of a right-to-sue-letter -- an action in which the employee takes no part" should count as the relevant "protected activity of the employee" for the purpose of determining temporal proximity).  Rivera has thus waived any argument as to why we should determine temporal proximity from the date of Guerrero's decision.  See Zannino, 895 F.2d at 17.

**B.**

While Rivera did not advance any arguments in his briefing to us as to how the District Court erred in granting summary judgment to the Administrator on Rivera's Title VII claims, Rivera filed a 28(j) letter after oral argument in which he stated that, with respect to the union grievance that closely preceded the OIG referral, his "allegations and arguments below[] show that it is pellucidly clear that [he] claimed the protections afforded by the anti-retaliation provisions under Title VII of the Civil Rights Act, not the Rehabilitation Act."  Rivera therefore appears to be arguing, via that letter, that the District Court erred in concluding that the OIG referral was not causally linked to his

union grievance, which, assertedly, constituted protected conduct under Title VII.  See Marrero v. Goya of P.R., Inc., 304 F.3d 7, 22 (1st Cir. 2002) (explaining that to make out a prima facie case of retaliation under Title VII, a plaintiff must show "that (1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity").

Setting aside the problem with raising an argument for the first time in this manner, see Hernandez Lara v. Barr, 962 F.3d 45, 52 n.10 (1st Cir. 2020) ("Rule 28(j) enables a party to apprise the court of 'pertinent and significant' legal authority that comes to its attention 'after oral argument but before decision,' not to introduce new arguments that the party failed to raise in its brief." (quoting Fed. R. App. P. 28(j))), the argument lacks merit.  There is no indication in the record that, prior to the OIG referral, Rivera complained about discrimination on any of the bases protected by Title VII -- namely "race, color, religion, sex, or national origin," 42 U.S.C. § 2000(e)-2(a).  Nor does any such argument appear anywhere in his briefing on appeal, which does not include any reference to Title VII.  Thus, no reasonable juror could conclude that the union grievance constituted protected conduct under Title VII.  See Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 107-08 (2d Cir. 2011)

("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's complaint was directed at conduct prohibited by Title VII." (cleaned up) (emphasis in original)).

## IV.

There is one loose thread to tie up: Rivera's challenge to the District Court's decision to grant the defendant's motion to strike his post-discovery affidavit. But even if we were to assume that there was merit to Rivera's argument that the District Court erred in striking the affidavit -- and we do not suggest that the argument has merit -- he still would have to show that the error provided a basis for overturning the District Court's summary judgment ruling. Rivera has not adequately explained, however, why the contents of the affidavit create a genuine issue of disputed fact as to any issue of fact that bears on our reasons for affirming the grant of summary judgment.

Rivera does note that the affidavit included an assertion that the "harassment" at issue in this case "caused him greater emotional damages than his experience in Afghanistan," an explanation of his "reasons for not applying to . . . a GS-13 position announced in January 2020," and an assertion that only one CEPD employee was qualified for that position. But we do not

see -- and Rivera does not explain -- how those assertions, or any others contained in the affidavit, would have allowed him to carry his burden to make out a prima facie case that he was discriminated against in violation of the Rehabilitation Act or Title VII, given the problems that we have identified above with each of his attempts to show that he had done so.  Thus, we need not further review the District Court's decision to strike the affidavit to affirm the grant of summary judgment to the Administrator on the Rehabilitation Act and Title VII claims before us in this appeal.

**V.**

For the reasons discussed above, we <u>affirm</u> the District Court's grant of summary judgment on Rivera's claims against the Administrator for discrimination and retaliation.

The parties shall bear their own costs.